Filed 9/22/17 (unmodified opinion attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| SAVE LAUREL WAY,<br><br>      Plaintiff and Respondent,<br><br>v.<br><br>CITY OF REDWOOD CITY,<br><br>      Defendant and Respondent;<br><br>LAUREL WAY JOINT VENTURE,<br><br>      Real Party in Interest and Appellant. | A147942<br><br>(San Mateo County<br>Super. Ct. No. CIV526753)<br><br>ORDER MODIFYING OPINION<br>AND DENYING REHEARING<br>[NO CHANGE IN JUDGMENT] |

BY THE COURT:

It is ordered that the published opinion filed herein on August 29, 2017, be modified as follows:

1. On page 11, add a new footnote 9 at the end of the section heading III, "Issues Under the SMA Are Not Ripe for Review." Footnotes 9, 10, and 11 in the filed opinion will be renumbered 10, 11, and 12, respectively.

The new footnote 9 will read:

Prior to the issuance of this opinion, and in its petition for rehearing, SLW argued that it should be allowed to file a supplemental brief on the issue of ripeness, citing to Government Code section 68081, which provides that "before . . . a court of appeal . . . renders a decision . . . based upon an issue which was not proposed or briefed by any party to the proceeding, the court shall afford the parties an opportunity to present their views on the matter through supplemental briefing. . . ." We denied the request. Under this statute, "[t]he parties need only have been given the opportunity to brief the issue decided by the court, and the fact that a party does not address an issue, mode of analysis or authority that is raised or fairly included within the issues raised does not implicate the protections of section 68081." (*People v. Alice* (2007) 41 Cal.4th 668, 679.)

Justiciability is present in every case, and the issue of ripeness is "fairly included" within LWJV's argument that the PDP does not violate any provisions of the SMA.

2. On page 12, delete subheading 1, numbering and title only. The text that follows will remain.

3. On page 13, first full paragraph, 10th line, add a short form to the cited case, so that the citation reads *Pacific Legal Foundation v. California Coastal Com.* (1982) 33 Cal.3d 158, 170 (*Pacific Legal*).

4. On page 13, last line, after the sentence that ends "certifying the EIR," add a new footnote 13. Footnotes 11 and 12 in the filed opinion will be renumbered 14 and 15, respectively.

> The new footnote 13 will read:

> In *Pacific Legal,* the Supreme Court adopted a two-pronged ripeness analysis used by the United States Supreme Court, requiring an evaluation of (i) "the fitness of the issues for judicial decision" and (ii) "the hardship to the parties of withholding court consideration." (*Pacific Legal, supra,* 33 Cal.3d at p. 171, italics omitted; see *Abbott Laboratories v. Gardner* (1967) 387 U.S. 136, 149.) Because we conclude the issue is not fit for judicial decision, we need not reach the second prong of this test: "A party seeking judicial review of an administrative decision must establish *both* that the issues are sufficiently defined for appellate review *and* that the party faces hardship as a consequence of court inaction." (*PG&E Corp. v. Public Utilities Com.* (2004) 118 Cal.App.4th 1174, 1222, italics added.)

5. In newly renumbered footnote 15, previously footnote 13, the last two sentences will be deleted and two new sentences will be added, so that the footnote reads in its entirety:

> SLW also argues that the trial court held the City failed to make a required finding that the project will provide " 'an environment of physical and functional desirability, in harmony with the character of the surrounding neighborhood' " and that LWJV waived this point by not addressing it in the opening brief. As the trial court's statement of decision is somewhat confusing on this point, we decline to treat the issue as waived because LWJV adequately addresses this finding in its reply brief. We agree with LWJV that other findings in the Resolution and the April 2013 planning commission's resolution explain how the Project will achieve the goal of harmony with neighborhood character.

This modification does not change the judgment.

The petition for rehearing is denied.

Dated: _____

Dondero, J.

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| SAVE LAUREL WAY,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>CITY OF REDWOOD CITY,<br><br>        Defendant and Respondent;<br><br>LAUREL WAY JOINT VENTURE,<br><br>        Real Party in Interest and Appellant. | A147942<br><br>(San Mateo County<br>Super. Ct. No. CIV526753) |

Real party in interest Laurel Way Joint Venture (LWJV) appeals from the trial court's order setting aside a planned development permit (PDP) issued by the City of Redwood City (City). LWJV represents 14 sets of owners of 18 undeveloped lots in the City who seek to build up to 16 homes on a street known as Laurel Way. Following the preparation of an environmental impact report (EIR), the City issued the PDP for a planned upgrade to Laurel Way, covering the first phase of a development project referred to as the Laurel Way Development Project (Project). The PDP includes such elements as a cul-de-sac for a fire truck turnaround, a fire hydrant, new streetlights, pedestrian pathways, an open space land dedication, and other civic improvements. It does not include any development on the individual lots. The court set aside the PDP, concluding the City had abused its discretion by failing to evaluate the legal status of the

18 lots under the Subdivision Map Act (Gov. Code, § 66410 et seq.)[1] (SMA or the Act). Because issues regarding the legal status of the individual lots under the SMA are not ripe for judicial review, we now reverse.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

The Project site along Laurel Way consists of approximately 4.75 acres. The site is contained in a hillside canyon and is steeply sloped. Laurel Way is currently a private, dead end street that is only partially paved. The Project includes undeveloped properties located along the unpaved end of the street.[2] The subject lots on the site range in size from between approximately 7,200 to 24,525 square feet, which is similar to the lot sizes found elsewhere in the general neighborhood. The average slopes on the subject lots range from 19 percent to 41 percent.

The City has divided the Project into two phases. The first phase involves improvements to the Project area, including paving the roadway, installing utilities and sewer connections as well as retaining walls, landscaping, drainage infrastructure, and planting replacement trees. The second phase involves the construction of individual residences on the lots. The second phase is not to commence until the first phase has been completed and approved by the City's community development director. The PDP at issue in this case pertains to the first phase of the Project.

On May 1, 2006, LWJV filed its first application with the City for a PDP. Seven months later, the City commenced review for an EIR.[3] Between October 2007 and June

---

[1] All further statutory references are to the Government Code except as otherwise indicated.

[2] Two lots within the Project area on Laurel Way already contain houses.

[3] The trial court concluded state law does not require preparation of an EIR under the circumstances presented here. However, in 1988 the City adopted a policy requiring an EIR prior to any new development on the subject portion of Laurel Way. This EIR was intended to analyze the full build-out of the street, with a goal of establishing guidelines for any future development. LWJV was formed in response to the policy requiring an area-wide EIR.

2

2009, the City planning staff held several workshops and public meetings concerning the Project.

In February 2010, the City circulated a draft EIR for public review, detailing the Project's potential environmental impacts and proposed mitigation measures.

On August 24, 2010, the City's planning commission certified a final EIR, adopting findings for mitigation measures, including a mitigation monitoring program. The EIR concluded that the Project as then proposed would have no significant environmental impact after mitigation.

On September 9, 2011, LWJV withdrew its original PDP application and submitted a new application, reducing by two the proposed number of residences.

In March 2013, a revised final EIR was prepared. The EIR was approved by the City's planning commission.

On April 1, 2013, the City's planning commission adopted a resolution approving the PDP. The resolution includes 63 conditions of approval.

On January 13, 2014, the City Council passed a resolution (Resolution) upholding the City planning commission's decision to certify the EIR and modifying the commission's approval of the PDP. The Project as approved contemplates that up to 16 new houses will be built, subject to additional permits, as well as to extensive additional conditions, and requirements.[4]

On February 13, 2014, respondent Save Laurel Way (SLW) filed a petition for writ of mandate and a complaint for injunctive relief asserting four causes of action for

---

[4] The Resolution affirmed and adopted the planning commission's resolution approving the project, which found that the Project as approved would not be detrimental or injurious "because the project has been found to be consistent with the community goals established in the City's General Plan and Zoning Ordinance." The Resolution also approved the planning commission's approval of the EIR. That approval includes a finding that the Project "provides a high quality, single-family residential in-fill housing project" that supports the City's goal of meeting its regional housing need under the housing element of its general plan.

3

(1) violation of the City's municipal code and zoning ordinance, (2) violation of the state Planning and Zoning Law (§ 65300 et seq.), (3) violation of the SMA, and (4) violation of CEQA (Pub. Resources Code, § 21000 et seq.).

On August 8, 2014, the City filed its answer to the petition and complaint.[5] In its answer, it indicated its view that the "lots within the Project area are legal conforming lots created by a tentative map in 1926, which lots do not conform with the current requirements of the [Redwood City] Zoning Code [RZO], but which the Zoning Code allows to nonetheless be developed." That same day, LWJV also filed its answer to the petition and complaint.

On October 24, 2014, a court trial was held, consisting of oral argument based on the administrative record and trial briefs filed by the parties.

On January 23, 2015, the trial court issued a proposed statement of decision.

On February 8 and 9, 2015, petitioners and real parties filed objections to the proposed statement of decision.

On November 20, 2015, the trial court issued the final statement of decision setting aside the PDP and vacating the City's certification of the EIR. Invoking the SMA and recent cases addressing older subdivision maps, the court concluded the City had abused its discretion in approving the Project because "[t]he facts and law *do not* support a finding that there are 16 legal lots upon which 16 homes can be built, and *do not* support a finding that the property owners have a vested right to develop each of the 16 alleged lots." LWJV has appealed.

## DISCUSSION

Among the arguments advanced on appeal, LWJV contends that the SMA does not require a city to evaluate lot legality before granting development permits or preparing an EIR under CEQA. The contention is persuasive. Because the SMA's

---

[5] The City is not a party to this appeal.

4

provisions were not invoked by the City's action in approving the PDP and the EIR, we conclude the subdivision map issues addressed by the trial court are not ripe for judicial review.

## I.      *Standard of Review*

"Code of Civil Procedure section 1094.5, the state's administrative mandamus provision . . . structures the procedure for judicial review of adjudicatory decisions rendered by administrative agencies. . . . Subdivision (b) of section 1094.5 prescribes that when petitioned for a writ of mandamus, a court's inquiry should extend, among other issues, to whether 'there was any prejudicial abuse of discretion.' " (*Topanga Assn. for a Scenic Community v. County of Los Angeles* (1974) 11 Cal.3d 506, 514–515.) "Abuse of discretion" is defined to include instances in which the administrative agency "has not proceeded in the manner required by law, the order or decision is not supported by the findings, or the findings are not supported by the evidence." (Code Civ. Proc, § 1094.5, subd. (b).) Additionally, the state Planning and Zoning Law provides: "No action . . . by any public agency . . . on any matter subject to this title shall be held invalid or set aside by any court . . . by reason of any error, irregularity, informality, neglect, or omission (hereafter, error) as to any matter pertaining to . . . findings . . . subject to this title, unless the court finds that the error was prejudicial and that the party complaining or appealing suffered substantial injury from that error and that a different result would have been probable if the error had not occurred. There shall be no presumption that error is prejudicial or that injury was done if the error is shown." (§ 65010, subd. (b).)

It is presumed that an administrative agency regularly performed its duty, and the burden is on the party challenging the agency's actions to prove an abuse of discretion. (*Young v. Gannon* (2002) 97 Cal.App.4th 209, 225; see *Kutzke v. City of San Diego* (2017) 11 Cal.App.5th 1034, 1042 ["[i]t is ' "*not* the role of the courts to micro-manage these development decisions. Our function is simply to decide whether the city officials considered the applicable policies and the extent to which the proposed project conforms

5

with those policies, whether the city officials made appropriate findings on this issue, and whether those findings are supported by substantial evidence." ' "].)

Our role on appeal is identical to that of the trial court. Thus, we are not bound by the trial court's determinations. (*Lucas Valley Homeowners Assn. v. County of Marin* (1991) 233 Cal.App.3d 130, 142; *Alberstone v. California Coastal Com.* (2008) 169 Cal.App.4th 859, 863.) The only exception to this standard of review arises where the trial court has made findings as to foundational matters of fact that could be conclusive on appeal; such findings must be accorded deference where supported by substantial evidence. (*Mike Moore's 24-Hour Towing v. City of San Diego* (1996) 45 Cal.App.4th 1294, 1303.)

## II.    *The SMA*

### *1. General Principles*

The SMA is " 'the primary regulatory control' " which governs the subdivision of real property. (*Gardner v. County of Sonoma* (2003) 29 Cal.4th 990, 996 (*Gardner*); *Hill v. City of Clovis* (2000) 80 Cal.App.4th 438, 445 (*Hill*).) Under the SMA, the " '[r]egulation and control of the design and improvement of subdivisions' "[6] is vested in local agency legislative bodies such as a city council, which must adopt ordinances on the subject. (See § 66411; *Gardner,* at pp. 996–997.) Generally, developers must design their subdivisions in conformity with applicable general and specific plans and comply with local ordinances. (*Id*. at p. 997; see *Hill,* at p. 445.)

---

[6] Section 66424 defines a subdivision, in part, as follows: " 'Subdivision' means the division, by any subdivider, of any unit or units of improved or unimproved land, or any portion thereof, shown on the latest equalized county assessment roll as a unit or as contiguous units, for the purpose of sale, lease, or financing, whether immediate or future. Property shall be considered as contiguous units, even if it is separated by roads, streets, utility easement, or railroad rights-of-way." (See *Witt Home Ranch, Inc. v. County of Sonoma* (2008) 165 Cal.App.4th 543, 559 (*Witt*).)

Under the current version of the SMA, subdivisions ordinarily " 'may be lawfully accomplished only by obtaining local approval and recordation of a tentative and final map pursuant to section 66426, when five or more parcels are involved, or a parcel map pursuant to section 66428 when four or fewer parcels are involved. [Citation.] A local agency will approve a tentative and final map or a parcel map only after extensive review of the proposed subdivision and consideration of such matters as the property's suitability for development, the adequacy of roads, sewer, drainage, and other services, the preservation of agricultural lands and sensitive natural resources, and dedication issues. [Citations.]' [Citation.] The [SMA] prohibits the sale, lease, financing or improvement of any parcel or parcels of real property for which a final map or parcel map is required under the Act unless a final map or parcel map has been recorded." (*Abernathy Valley, Inc. v. County of Solano* (2009) 173 Cal.App.4th 42, 48 (*Abernathy*).)

The subject lots at issue in the present case were created as part of a residential subdivision when the Project area was under the unincorporated San Mateo County jurisdiction. The applicable 1926 subdivision map (1926 Map) reflected a survey, platting into lots, and creation of hundreds of numbered parcels, for purposes of division of land for sale. The City annexed the property along the end of Laurel Way, including the lots that are the subject of the PDP, in 1969. The Project area is currently designated Low Density Residential under the General Plan, and Residential-Hillside under the Zoning Ordinance.

### 2. *Historical Overview of the SMA*

As noted above, the lots within the Project site were subdivided in 1926. To understand the basis of the trial court's ruling it is necessary to review the history of the SMA.

"The Subdivision Map Act has regulated the division of land in California since the nineteenth century. 'The first Subdivision Map Act was enacted in 1893. Subsequent versions of the Act were enacted in 1907, 1929, 1937 and 1943. The modern latest

7

version of the Act was enacted as part of the Government Code in 1974.' [Citation.] 'All versions of the Act enacted subsequent to the first Act in 1893 contained grandfather clauses exempting from the current Act those subdivisions established in compliance with laws in effect when recorded.' [Citation.]

"In the earliest twentieth-century version of the Act, 'development was left almost entirely to the discretion of the developer. The act provided for no governmental regulation, and required submission of a subdivision map to local officials only to allow them to check its accuracy in order to assure good title to the resulting parcels.' [Citation.] 'With the advent of zoning in the 1920s, subdivision mapping began to assume some importance as a land use control.' [Citation.] The 1929 version of the Act first authorized local subdivision regulations. [Citation.] The 1937 enactment first prohibited sellers from conveying subdivided lots without prior local approval. [Citation.] 'The 1937 enactment was the basis for the 1943 codification which, together with many amendments thereto, remained in effect until the 1974 recodification. [Citation.]' [Citation.] But by the late 1960's, 'many uncoordinated amendments' had rendered the Act 'so complex and disorganized that the need for recodification was apparent. Following attempts in 1971, 1972 and 1973, the Subdivision Map Act, which had been codified in the Business and Professions Code ([§] 11500 et seq.), was recodified in [Government Code section] 66410 et seq.' " (*van't Rood v. County of Santa Clara* (2003) 113 Cal.App.4th 549, 563.)

### 3. *The SMA's Grandfather Provision*

The trial court focused on whether the 1926 Map is covered by the SMA's current grandfather provision, which provides that the prohibitions on selling, leasing, financing, or improving parcels on maps that do not comply with the SMA do not apply to "any parcel or parcels of a subdivision offered for sale or lease, contracted for sale or lease, or sold or leased in compliance with or exempt from any law (including a local ordinance), *regulating the design and improvement of subdivisions* in effect at the time the

8

subdivision was *established*.ʺ  (§ 66499.30, subd. (d), italics added; see *Gardner, supra,* 29 Cal.4th at p. 998.)  The trial court concluded it was "highly unlikely" that the 1926 Map was " 'in compliance with or exempt' " from any law " 'regulating the design and improvement' " of subdivisions as specified in this provision because the County of San Mateo did not have any such laws in 1926.[7]

     *Gardner,* the leading case interpreting section 66499.30, subdivision (d), stands for the proposition that maps recorded before the effective date of the first statewide map legislation (which was enacted in 1893), and that were not subject to other local statutes or regulations governing the subdivision of property at the time they were recorded, are not entitled to the protection of the grandfather provision.  (*Gardner, supra,* 29 Cal.4th at pp. 1001, 1002–1003.)  Specifically, the Supreme Court held that the recording of a map before 1893 did not "establish" the subdivision depicted on the map within the meaning of section 66499.30.  (*Gardner*, at pp. 1000–1001; see pp. 1003–1004 [recordation before 1893 also did not "create" subdivision within meaning of § 66451.10, subd. (a)]; p. 1006.)  *Gardner* left open the question of whether maps recorded under statewide subdivision map laws in effect between 1893 and 1929 legally created or "established" subdivision parcels when recorded and thus were covered by the grandfather provision.  (*Gardner,* at p. 1001, fn. 7.)

     Subsequently, in *Witt,* the Court of Appeal ruled that maps filed in compliance with subdivision map laws in effect in 1915 are not covered by section 66499.30, subdivision (d).  (*Witt, supra,* 165 Cal.App.4th at p. 548.)  The court concluded these early laws did not purport to regulate the "improvement" of the subdivision and thus they did not regulate the " 'design and improvement' " of subdivisions within the meaning of the grandfather clause.  (*Ibid.*)  Nor did such laws regulate the " 'design' " of

---

    [7] The trial court noted, however, that it appeared the 1926 Map was in compliance with state laws that were in effect at the time.

9

subdivisions since they "omitted any regulation of the primary characteristic of a subdivision—the division of a large parcel into smaller usable lots." (*Id.* at p. 562.) The 25-lot map at issue in *Witt,* for example, was "a planning anachronism, merely a grid laid across a parcel of land. There is no indication that any consideration was given to the appropriate siting of residences, lot drainage, the feasibility and construction of utility service, or any of the many other issues that arise when development occurs. It is difficult to imagine a plan for real estate development more at odds with modern subdivision regulation." (*Id.* at p. 563.)

In *Abernathy*, a property owner sought a writ of mandate to compel the county to issue a "certificate of compliance"[8] reflecting that one of 25 lots identified on a parcel map recorded in 1909 was in compliance with the requirements of the SMA and thus could be legally sold as a separate parcel. (*Abernathy, supra,* 173 Cal.App.4th at p. 45.) In reversing the trial court's grant of relief, the appellate court explained that "even assuming [the lot] was 'established' when the [parcel map] was recorded in 1909," the subdivision law in effect at that time was insufficiently detailed to qualify as one which " 'regulat[ed] the design and improvement of subdivisions.' " (*Id.* at p. 51.) Consequently, the court could not certify those lots as in compliance with the Act: "To permit maps recorded in compliance with these laws to be grandfathered under the current Act would seriously undermine the objectives of the Act." (*Abernathy,* at p. 51.)

In *Hays v. Vanek* (1989) 217 Cal.App.3d 271 (*Hays*), the defendant asserted a subdivision map filed in 1926 had validly subdivided his 40 acres into approximately 630

_____

[8] A developer may request a determination from the appropriate local agency as to whether the property at issue complies with the SMA and applicable local ordinances. (§ 66499.35, subd. (a); *Gardner, supra*, 29 Cal.4th at p. 998.) If the property is found in compliance, the agency issues a certificate of compliance which is recorded in the county where the parcel is located. (§ 66499.35, subd. (a); *Gardner,* at p. 998.) Conversely, if the property is noncompliant, the local agency may issue a conditional certificate of compliance, imposing conditions that the owner must fulfill. (§ 66499.35, subd. (b); *Gardner,* at p. 998.)

parcels, all of which he was entitled to sell separately. (*Hays*, at p. 287.) The appellate court found that a subdivision map filed in 1926, the same year as the map at issue here, would be subject to the requirements of the 1907 version of the SMA. (*Hays*, at p. 288.) Significantly, the *Abernathy* court's holding that the lot at issue did *not* qualify for grandfathering was also based on the laws reflected in the 1907 SMA. (*Abernathy, supra,* 173 Cal.App.4th at p. 51.)

### 4. The Trial Court's Ruling

The trial court reasoned that "the issue is *not* whether the 1926 subdivision map here complied with the law as of 1926, but whether it complies with the law now or otherwise fits squarely within the grandfather clause under the present language." Relying on *Abernathy* and *Hays,* the court concluded there was no showing in the record that any applicable "design and improvement" laws existed when the 1926 Map was filed. Thus, it did not appear that the parcels in the Project would fall within the SMA's grandfather provision. However, the trial court did not make an ultimate finding as to whether the lots are illegal. Rather, it found that the city abused its discretion because it expressly found all 16 Project lots were legally created without having considered their status under the SMA. While the court's reasoning is not inconsistent with the pertinent authorities, its ultimate conclusion is flawed.

### III. Issues Under the SMA Are Not Ripe for Review

The City concluded the subject lots are presumptively entitled to legal status based on section 33.2 of the RZO. That section provides, in part: "A nonconforming lot or parcel may be used for development subject to compliance with all other provisions of this article and other applicable codes. . . ." It is true the City did not also separately evaluate the status of the lots under the SMA.[9] However, it does not necessarily follow

---

[9] The city council found that each of the lots in the Project area are nonconforming lots that do not comply with the current minimum lot size requirements set forth in the RZO for such steeply sloped lots. The City noted that had LWJV proposed a new

that the City committed a prejudicial abuse of discretion in issuing the PDP and certifying the EIR.

### 1. The SMA Was Not Implicated by the City's Approval of the PDP

Unlike the present case, in the principal cases cited to by the trial court and relied on by the respondents here, the issues concerned landowners seeking status or relief under the current version of the SMA for properties subdivided under older maps. In *Abernathy,* a landowner had appealed after a county denied his request to record a certificate of compliance with the SMA for a lot that had been subdivided under a map recorded under the 1907 SMA. (*Abernathy*, *supra*, 173 Cal.App.4th at p. 45.) In *Hays,* a defendant sought declaratory relief that he need not comply with current SMA based on the argument that his property had been validly subdivided under a 1926 subdivision map. (*Hays*, *supra*, 217 Cal.App.3d at p. 287.) In *Gardner,* the plaintiff landowners sought to establish that property subdivided under an 1865 subdivision map was entitled to legal recognition under the SMA. (*Gardner*, *supra*, 29 Cal.4th at p. 994.)[10]

It is undisputed that the PDP grants authorization to proceed only with infrastructure improvements to the Project area.[11] As LWJV correctly notes, nothing in the SMA prohibits construction of improvements such as those allowed by the PDP. The

___

subdivision map for the area, the RZO would not have allowed the creation of more than four or five lots. The City observed that the lots had already been created by the 1926 Map and concluded "[n]o credible evidence has been presented to demonstrate that these lots are unlawful." Specifically, the City found that the owners were conditionally entitled to develop the lots under RZO section 33.2, including obtaining a planned development permit for lots having a slope greater than 30 percent.

[10] Our decision in *Save Mount Diablo v. Contra Costa County* (2015) 240 Cal.App.4th 1368, 1382 also concerned landowners who sought certificates of compliance.

[11] As stated in the Resolution, Phase I of the Project includes the new paved private roadway, pedestrian paths, utilities, sewer connections, retaining walls, landscaping, drainage infrastructure, and the planting of replacement trees. Phase II of the Project is the construction of the individual residences, which cannot commence until Phase I has been satisfactorily completed.

prohibitions of the SMA are found at section 66499.30, subdivisions (a) and (b): "No person shall sell, lease, or finance any parcel or parcels of real property *or commence construction of any building* for sale, lease or financing thereon" without compliance with, or exemption from, the SMA. (Italics added.) Here, the PDP *does not* allow any owner to construct any buildings on any of the subject parcels. Whether any building will be constructed will turn on the issuance of permits during the *second phase* of the Project.

"The ripeness requirement, a branch of the doctrine of justiciability, prevents courts from issuing purely advisory opinions. [Citation.] It is rooted in the fundamental concept that the proper role of the judiciary does not extend to the resolution of abstract differences of legal opinion. It is in part designed to regulate the workload of courts by preventing judicial consideration of lawsuits that seek only to obtain general guidance, rather than to resolve specific legal disputes. However, the ripeness doctrine is primarily bottomed on the recognition that judicial decisionmaking is best conducted in the context of an actual set of facts so that the issues will be framed with sufficient definiteness to enable the court to make a decree finally disposing of the controversy." (*Pacific Legal Foundation v. California Coastal Com*. (1982) 33 Cal.3d 158, 170.) To be ripe, " '[t]he controversy must be definite and concrete, touching the legal relations of parties having adverse legal interests. [Citation.] It must be a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts.' " (*Id.* at pp. 170–171, quoting *Aetna Life Ins. Co. v. Haworth* (1937) 300 U.S. 227, 240–241.)

There are no issues ripe for adjudication under the SMA in the present case because that legislation is not squarely implicated by the City's actions in approving the PDP and certifying the EIR. Again, the SMA does not prohibit development permit

13

approvals.  Nor does it apply to the certification of environmental studies under CEQA.[12] Simply put, the City did not make any decisions invoking the SMA, much less one subject to a writ of mandate for being in violation of that legislation.  Unlike *Abernathy, Hays,* and *Gardner,* no party here has sought a certificate of compliance or other relief under the SMA.  And while LWJV takes the position that the City's grant of the "master" PDP necessarily compels the issuance of certificates of compliance for all lots in the Project area (see § 66499.35, subd. (c)), at trial the City's counsel stated that the City had not yet considered this issue because the first phase of the Project does not involve direct dealings with the individual lot owners.  While it appears the SMA's provisions may come into play as the individual members of LWJV move to construct homes on their properties, at this juncture any judicial pronouncements as to these issues is premature.[13]

Our holding in this appeal is a limited one.  We conclude the approval of the PDP in Phase 1 of the Project involves only the development of an infrastructure for the land involved.  The SMA is not implicated in Phase 1.  The validity of conveyance by implication in Phase 1 is not before us.  Adjudication of any issue under the SMA is not ripe.  In light of our conclusion, we need not address the parties' remaining arguments.

---

[12] The EIR was based on the assumption that 18 new homes would be constructed. It was also based on the assumption that the owners had a right to reasonably develop each property, noting that "[o]ver time, each lot *could* be developed on an individual basis under current City regulations."  (Italics added.)  This was seen as potentially detrimental, as piecemeal development would not result in a comprehensive plan for infrastructure improvements.  Under the circumstances, the phased development strategy undertaken by the City does not suggest an abuse of discretion.

[13] SLW also argues that the trial court held the City failed to make a required finding that the Project will provide " 'an environment of physical and functional desirability, in harmony with the character of the surrounding neighborhood' " and that LWJV waived this point by not addressing it in the opening brief.  We need not evaluate this contention as the court's discussion on this point pertained to whether a use permit was required.  The court concluded no such permit was required at this stage, and SLW has not appealed from that finding.

## DISPOSITION

The judgment is reversed.

_____

Dondero, J.

We concur:

_____

Humes, P. J.

_____

Margulies, J.

A147942  *Save Laurel Way v. Laurel Way Joint Venture*

16

Trial Court:   San Mateo County Superior Court

Trial Judge:   Hon. Marie S. Weiner

Counsel:

Warhurst Law Office, William R. Warhurst, for Real Party in Interest and Appellant Laurel Way Joint Venture.

Shute, Mihaly & Weinberger LLP, Winter King, Peter J. Broderick, for Plaintiff and Respondent Save Laurel Way.

City Attorney of Redwood City, Pamela Alison; Jarvis, Fay, Doporto & Gibson, LLP, Rick Jarvis; Burke, Williams & Sorensen LLP, Michelle Kenyon, for Defendant and Respondent City of Redwood City